My name is Robert Baldwin representing the Petitioner Montana Sulphur & Chemical Company. With me at council table is Benjamin Alke also with me on the briefs. I just mentioned the 9,000 pound per year figure that council mentioned obviously as a very significant figure. I will get to this in a moment. 18 million pounds a year is the amount of reduction in the amount of carbon dioxide that is released into the atmosphere. 18 million pound reduction resulting in emissions from the consent decree with Cenex. 18 million pound reduction from that refinery's consent decree alone not counting the Exxon Mobil and ConocoPhillips consent decrees and reductions. EPA ignored that 18 million pound per year reduction in setting the FIP limits. It said we're not going to account for that. We're going to assume limits are way up here even though in reality by an enforceable federally enforceable consent decree they were down here. So 9 million pounds may sound like a significant amount. EPA ignored many times that amount in actual enforceable provable reductions in setting FIP limits. We'll get to that in a minute. EPA has statutory authority and indeed a mandate to issue a FIP within two years at any time within two years after SIP disapproval which occurred in 2002. Four years later two years after the deadline EPA proposed a FIP. Six years after SIP disapproval EPA finally promulgated a FIP. In General Motors the United States Supreme Court rejected an argument that a particular provision in the Clean Air Act had an explicit deadline that barred later action. It said there's no such deadline in that statute that we're arguing about but if you want to see an explicit deadline of the kind petitioner urges look at and then cite it among other things the very statute that Montana SOFA relies on here. The Supreme Court said that's an explicit deadline of the kind GM argues about. Now EPA did not address that case at all in its response brief. We argued in our opening brief you won't even find it in EPA's table of cases. They chose to ignore it. But there are very good reasons why that two year limit is supported by policy. First of all the Clean Air Act contains a dual role for the states and federal governments. I will not bore the court with these cases. They're discussed but basically states have primacy. Congress did not intend for the federal government to intrude upon the question of how states choose to meet NAAQS. So states have primacy. This is not a case where EPA is authorized to go out and regulate. EPA promulgates NAAQS. States decide how to get there. Second, the Federal Oversight Authority is secondary, strictly circumscribed. The 1990 amendments were intended to keep it in bounds. That's either the Virginia case or the Florida Power and Light. I forget. Both are cited in the briefs. So EPA is on a short leash here. EPA does not have a roving commission to go regulate. The third policy reason supporting this is the possibility of changed conditions. And that's what we have here. The SIP disapproval came in 2002. Within two years it might have made sense to FIP, if I can use that as a verb. Six years later it made no sense. There were significant intervening changes. One of them was consent decrees with the refineries, as I indicated. The reduction, not the limitation, but the reduction from the Senex consent decree by itself was 9,000 tons per year, 18 million pounds per year. Compare that to a 12 pound per three hour limit that EPA is straining at in both the SIP and the FIP and say we have to have all these redundant monitoring requirements because it's 12 pounds per three hours. But then it wants to ignore the fact that there's an 18 million pound reduction from one of the refineries and I haven't even talked about the other two refineries. So that's an overarching problem with this entire SIP. Excuse me, the entire FIP. Brock and National Petrochemical are the cases EPA cites for the proposition that just because we ignore a statutory deadline that Congress has imposed, it doesn't mean anything and we can still do what we want. Those cases are different. In this case, if the deadline means something, as General Motors indicated it did, and as we presume Congress meant, then what it means is EPA cannot issue this FIP. EPA still has its statutory oversight role and if, based on current conditions, it wants to call for a SIP revision because current conditions indicated substantial inadequacy, it could still do that. Congress's intent is not frustrated. Air quality does not suffer. Unlike Brock and National Petrochemical where imposition and enforcement of the deadline is saying too bad, gotcha, you can't do it, that's not this case. EPA still has a statutory role and could do that if it chose. Perhaps that's why General Motors indicated this is that type of explicit deadline. In any event, if EPA chooses to take that route, in the meantime, air quality is still very good in Billings, Montana, well below the NAAQS. Now EPA, I want to turn attention now to something else. The EPA's role. EPA says when we issue a FIP, we get to stand in the shoes of the state and we can do whatever a state can do. Now that's an important claim for EPA to make because states can regulate more stringently than is required to meet NAAQS. States can act arbitrarily, frankly, and it's not a matter of federal law. States can require infeasible technology. We've cited that case. It's the Texas case. States can actually outlaw things like, for instance, flaring, impose limits, but that doesn't mean the EPA could do it. States can outlaw entire classes of industry. The EPA can't do that. So to claim to stand in the shoes is a significant claim. EPA has no statutory authority for that. The definition of a FIP is that it fills gaps or corrects inadequacies in a SIP. That's on section 7602 sub Y. A SIP only has gaps to be filled or inadequacies to be corrected to the extent that it doesn't meet NAAQS. So the EPA's rationale that, well, gosh, we're FIPing, we can do anything we want, is just wrong. In any event, EPA seems somewhat... Central Arizona involved a visibility SIP that EPA disapproved. FIP? It started with a SIP. EPA disapproved a SIP. Having disapproved the SIP, it then issued a FIP. In issuing the FIP, it had to attribute the visibility problem to a source. There was a regulation that said how you attribute the visibility problem to a source. It said the state can do it this way. EPA did it that way. And the source said, but the regulation says a state, you're not the state, you can't do it that way. That's where this court said, well, in that attribution regulation, EPA stands in the shoes of the state. That makes perfect sense. That's not a broad statement that EPA stands in the shoes of the state for all purposes. That was only a specific regulation about how you make an attribution of visibility problems to a specific source. Interestingly, this court adopted that language that EPA argued. That language appeared in EPA's Federal Register entry for that very action. It said, we stand in the shoes of the state. And it cited nothing. There's no citation of authority there. But it convinced this court to pick up on that. And if you'll search that term on Westlaw, you will see that EPA has liberally wielded this court's statement to that effect in arguing to expand its authority. But there is, in fact, no statutory authority. And if you trace it back to its root, it's an unsupported and unsupportable statement by EPA. Now, on the Arizona Public Service case, the Tenth Circuit case, the New Mexico case that they also cited, that was an entirely different case. The Clean Air Act says that the EPA can choose to treat tribes as states or not. It can decide to directly administer the act on tribal lands. In that case, in the issue that was under consideration, EPA had chosen to directly administer. So when the court said in that case that the EPA can adopt a superior plan, well, yes. It had no state to which it must defer. It was not playing a secondary and strictly circumscribed role. It was acting pursuant to express congressional authority that it could directly administer. So that case proves nothing in terms of this case. I want to now talk about specific problems with the FIP, if I may. Vigil v. Levitt, this court's decision said that the agency must articulate a rational connection between the facts found and the choice made. It indicated the court must carefully review the record and not rubber stamp. EPA's entire FIP is built on assumptions. EPA assumed, because the state modeled flares, that a flare limit was necessary. EPA assumed that 150 pounds was appropriate, even though it conceded that it modeled 500 pounds for three hours, and that still protected NAAQS. EPA assumed that because there was going to be a routine limit that was built on assumptions, it needed to apply during SSM. EPA assumed because it needed limits, it needed monitors. EPA assumed that the three hour limit, the 12 pound per three hour limit on the auxiliary vents was necessary because the state modeled it. EPA assumed that it required expensive and troublesome monitoring because there was this 12 pound per three hour limit. Finally, and most significantly, not finally, but finally in my list, EPA assumed that emission rates had not changed. That is demonstrably false. The consent decrees, as I indicate, 18 million pound a year reduction in one refinery alone, and EPA said we're going to ignore that. And you know what, maybe that's why there's a two year limit. So when EPA gets around to overriding the state policy choices and intruding upon an area that historically belongs to the states, that it does so based upon current information and not stale, outdated, and demonstrably false information. On the flares, I want to make very clear, MSCC does not seek permission to flare at will. MSCC is already subject to a work practice standard by which it must minimize the amount of flaring occurrences and the amount flared during each one. The problem here is that EPA said 150 pounds per three hours. Why? Well, because that's what the state modeled and it's got to apply during SSM. MSCC is going to be in violation of federal law. It's going to be. It can't not be because you can't not flare and operate in these industries. Flares are a safety device. You have high pressure streams of high temperature gases that are toxic and explosive coming down the pipe. When something goes wrong with your system or you have to pull a unit offline to maintain it so it doesn't blow up later and create a bigger problem, you've got to route those gases somewhere and that somewhere is a flare. EPA knows that. In this case they recognized there are going to be unavoidable instances of flaring that exceed this limit. EPA said that. They agreed that we're going to adopt a rule that MSCC can't meet. EPA also knows, and I can prove it with two other points besides their admission, no other SIP or FIP in the country has a strict numerical limit on flares during SSM. There are hundreds of air quality control regions in this country. Each of them has a SIP or a FIP and not a single one of them has this requirement. EPA says it's required by the Clean Air Act. Well, if that were true, EPA would be calling for SIP revisions on all of those other SIPs. They are not doing it because they know it's not true. On the NSPS regulations, that's the New Source Performance Standard, if you will, the latest and greatest control measures. MSCC pointed out in its briefs that EPA proposed what? A work practice standard, just like Montana sulfur is subject to under the state rules. It doesn't impose a strict numerical limit on flares during SSM. In fact, those regulations, two months after issuing this FIP and saying the act requires a strict numerical flare limit during SSM, two months later in June of 2008, EPA issues these proposed changes to these regs. By the way, the regs have exempted flares from a strict numerical limit during SSM since the 70s. We're talking about the latest iteration from the EPA. They say they're a safety device. There's no feasible alternative to flaring. And this is a quote. There's going to be work practice standards, quote, because it is not feasible to prescribe or enforce a standard of performance for these emission sources. If we agree with your position on flare-ups in the prior case, do we need to reach it here? If this court reverses the EPA's disapproval of MSCC SIP insofar as it did not have flare limitations, then I think that's a finding that the SIP was not inadequate to that extent and EPA has no authority to FIP, so I think the answer is no. EPA even recognized that, quote, requiring treatment of these gases is either technically or economically infeasible. EPA recognized even that it was infeasible to requiring monitoring of flare gases. And this is during the periods of SSM? Yes. So that's the only little part in contention here. That's what really is problematic for MSCC. MSCC does not routinely use its flares, but what EPA did... And is there an out for that, a defense for that, if it's infeasible? Oh, EPA has crafted an affirmative defense of sorts. What they've said is we're going to outlaw what we know is unavoidable, but give you an affirmative defense. That affirmative defense is inadequate for several reasons, if I may. Bunker Hill, this court's decision in Bunker Hill said EPA can't outlaw that which is unavoidable. So it didn't say you can outlaw it as long as you provide this onerous affirmative defense and shift the burden to the source. EPA has to show that the technology actually exists. That's Bunker Hill. Before you impose a limit, you have to show that the technology actually exists to do that. Bunker Hill basically says if you have a standard that you can't always meet as long as there's an escape hatch in effect, then that's not an illegal imposition of the standard, right? Essentially. That and Marathon Oil read together, yeah. Okay. But hear what EPA did. It didn't say, okay, this strict numerical limit doesn't apply during flaring. We will give you a work practice standard there, just like we do for brand-new state-of-the-art facilities. They said, no, here it's necessary to treat these four small sources in Buildings, Montana more strictly than any other source in the country. We're going to treat you differently, sources, and we're going to make you meet this strict numerical limit under penalty of law unless you take the burden to prove that it was unavoidable, etc. Even if that were permissible in the abstract, it's certainly arbitrary and capricious to do it here when it's done nowhere else, including on brand-new, shiny, state-of-the-art facilities with the latest and greatest control technology. Marathon Oil. Let me just go back to this flare issue. So your position is that actually it's technologically infeasible during the SSM period. It is, yes, it is. At least the standard set. Yes, it's impossible to meet those limits during SSM events, and it's impossible to monitor the flaring that does occur during SSM events for a whole bunch of technical reasons involving the capability of flow meters at the high and low ends of the ranges and so on. Your Honor, Marathon Oil said a promise of prosecutorial discretion is not enough, and decides that affirmative defense didn't protect the sources from citizen suits. Well, the affirmative defense here doesn't apply to citizen suits. MSCC faces unlimited liability to citizen suits, even if it meets the affirmative defense, because EPA has outlawed that which MSCC cannot prevent. And for that reason alone, the affirmative defense is an inadequate answer to this problem. The excess emissions policy is entitled to no deference under Chevron, not even under Skidmore. The Skidmore deference that suggests an agency pronouncement is entitled to deference, given its power to persuade and its consistency with other pronouncements. Well, think about how consistent it is with the NSPS regs that say it's not safe and it's not feasible to outlaw flaring or to limit flaring during SSM. And now they're saying the excess emissions policy should be applied to do just that. That is entitled to no deference. On the variable emissions, it cannot be anything but arbitrary and capricious to treat MSCC differently than other similarly situated sources. That is the definition of arbitrary and capricious. On the 30-meter stacks, all I'll say is that 12 pounds per three hours compared to 18 million pounds a year that they ignored from one refinery alone. But then they say we have to strain and impose all these redundant, troublesome, and expensive requirements on MSCC for 18 tons a year, is what the 12 pounds per three hour works out to be. So it just is utterly inconsistent and it's arbitrary and capricious. You have 45 seconds left. On stack height, MSCC had verified many different ways. EPA says we didn't have to consider those. We only had to consider what the state approved. But if it's going to set an emission limit, it has to determine GEP, which is the greater of one, two, and three things. It had to consider all our demonstrations. I'd like to save my remaining 20 seconds. Thank you. Good morning, Your Honors. My name is Martin McDermott. I'm an attorney with the U.S. Department of Justice. I represent the respondent, United States Environmental Protection Agency, and with me at Council's table is Jonah Stoller from EPA Region 8 who worked on the rules in question. I'd like to start by just mentioning one, I think, important point that sort of crosses over both of these cases, and that is if you read Montana Software's opening brief, certainly in the last case and I think in this case as well, there is a suggestion, I believe, that actual measurements are the way to go. You just use monitored data and that drives everything. But I would point out to the Court that when they filed a brief supporting their motion for stay, they said this, EPA's, and this is at page six, it's in our brief, EPA's regulations for SO2, although not other pollutants, allow EPA to determine attainment through computer models rather than actual measurements. That's what they said. They later attempted to walk far away from that concession, and the concession was correctly stated there. It was correct. They should have stayed with it. One overarching point here is that EPA did not regulate at will. It did not ride roughshod over the state. It did not wholly alter the state implementation plan they submitted. It was really a surgical approach that EPA took. If you look at what is at stake here, it is a relatively discreet and small number of issues, many of which I described earlier as down in the weeds and decisions that EPA made that are precisely the sorts of decisions that courts routinely accord EPA not only deference but extreme deference on. And there I'm referring to its reading of its own regulations, its determinations on stack height, its determinations on what kind of modeling is appropriate, what kind of monitoring is appropriate. Those are all the sorts of decisions that one could quibble with. One could even have good arguments that, well, there's a better way to do it. That's not the question. The question for the court is, did EPA act irrationally? Did it act arbitrarily? Is there no basis in the act for perhaps being overly conservative and attempting to assure attainment? I would submit that virtually all of those issues that they are raising could be resolved by reference to that essential fundamental point that EPA gets deference on these types of questions. Montana Sulphur also argues that you did not act timely. Correct. Yes, I'd like to turn to that. How do you respond to that? This is another place where I believe Montana Sulphur made a very ñ not walk away from, and what they said was when they were opposing consolidation in this case, here's what they said, and I'm quoting. This is in their consolidation opposition. This action, the 2008 FIP action, will not address whether EPA had the authority to issue a FIP, but will address the appropriateness of the emission limitations imposed by the FIP. That's what they told this court. Now they're running far away from that, and they're fundamentally challenging. Since we denied that motion, does that somehow bind Montana Sulphur? Is it binding? Well, I'll leave that to the court to determine whether that ñ Suppose we get to the merits of it. Yes. I mean, the suggestion is the Supreme Court has pointed to this very provision and said that is enforceable. Well, I think what the Supreme Court said, and it seems obvious to us, and that's why we didn't brief it at length, is, yes, it's a deadline. It manifestly is a deadline. But the question is, you don't answer the fundamental question here, which is does the agency lose authority to act by determining whether it's a deadline. The way the act is structured is that it contemplates that statute-imposed deadlines, EPA in many cases meets them, in some cases it does not meet them. What happens then? There's a citizen supervision that says, EPA, you had a deadline of two years to issue the FIP. We're going to district court, and we're going to demand that you satisfy that. They go to district court. The court looks at that and says, doesn't have to look at a Supreme Court case on it, looks at the statute and says, there's a deadline here, EPA. You had two years. EPA would say, well, you're right, we did, we missed the deadline. And then the court would impose a deadline, a new deadline on EPA. But that didn't happen here. No, because no one ever challenged it. So the only deadline is the one in the statute. Yes, it's still there. But if EPA had not, the issue is still there. I mean, if EPA had not issued the FIP in final form, we would be looking at the likelihood, I would say, of a citizen's group saying, going into court with a slam dunk paper that says, you did your disapproval in 2002, and under this court's AIR case, A-I-R, I think it's Association for Irritated Residents, it was just issued in February of this year. If EPA disapproves a SIP, it is obligated to do a FIP. It has to. There's no out where EPA could, I wouldn't say that it ever does this intentionally, exploit. But the statute never contemplated that if EPA misses the deadline, then it loses authority. That is absolutely not how it works. I mean, you say that, but what do you point to to support that? Well, I mean, I point to it would be at odds with, I mean, there's probably at least three or four quick rejoinders on that. One, it's at odds with how the world works. You know, in the case that we explained to the court, this court, someone was in front of this court saying EPA missed the SIP deadline in 1988, and this court said, EPA, do a FIP and do it by 1992. And so it was four years after. I mean, if you accept their argument, basically this court should have just said, this case is done. We don't need to talk about anything here. Two years are over. Sorry, you lose to a party who was trying to get vindication of its rights. The D.C. Circuit, in the case that we said in the brief also, said, here's how the situation works here. If Congress has a deadline and the agency misses it, you don't say they lost authority except perhaps in a very rare case. You look at what does the statute require. Well, the statute says that they have to do a FIP. They're obligated when the agency disapproves a SIP, they are obligated to fill the gaps. If they miss the deadline, they don't lose that. And so I think that's just elusive. You might be right, but this is a peculiar situation because there is a different authority here, that is to say the state of Montana, that is regulating the same thing you're supposed to be. So there is in place regulatory limits and enforceability whether you act or not. Yes, but they've been ---- It's a little different from some other circumstances in which EPA is the regulator. I suppose it is. I mean, it has a certain difference, but EPA made a finding in 2002 that it disapproved that SIP. And if this Court upholds that decision, then I would suggest that the Court should look at the AIR case that was decided earlier this year that says in that situation, thou must FIP. There's nothing in there that suggests that if EPA sits on its heels, that suddenly the deadline is lost. And I think what the D.C. Circuit case I'm talking about says is that you look to the intent. Congress is saying if we don't have a SIP that's adequate, then EPA, you have a job to do. And that's what this Court said back several decades ago. The Clean Air Act amendments in 1990 were, with all deference to the states, they had a very clear recognition, and this Court noted it, that sometimes EPA has to force the states to do the right thing. There's a lot of recitation here to cases decided back in the 1970s where there, I think, was a hope that the states would rise to the challenge and get the job done in all situations. But the Congress recognized in 1990 that it doesn't always work like that. And when it doesn't, and when the SIP is not adequate in all respects, not only for attainment of the NAAQS, but also to meet all the requirements for monitoring and other things, EPA has a job to do. It is to issue a FIP. I'd point out one other thing that I think is an important point here, and that is this argument, this lost, you lose authority argument, was not raised in comments to the agency. There's no rejoinder to that here. They did not claim that EPA lost authority to act. So they waived the argument, and the law is very clear on that. There's case law on it, common sense case law, from the courts of appeals all over the country, that if you don't raise an argument in comments, it's waived. But here, the Clean Air Act actually has another hammer where actually there's a statutory provision in the act that says, on judicial review, unless an issue is preserved, raised in comments, it's waived. So there are many, many cases that say that's the case, and I would submit that this argument is waived. Let's move on. Let me ask you about the flares and the SSM period. There seem to be two issues there. One, the claim that it's not feasible and that an after-the-fact immunity isn't really an after-the-fact immunity, particularly given the exposure to citizen suits. And then the other claim that comes out in the briefs is the inconsistency of EPA on this point. It has its memorandum. Then it does things differently in one case. Then it says, no, you can't have any immunity. Then it doesn't. And so how can we give deference to a moving target? Yes. I don't believe there is a moving target in the context of SIFs and the NACs. What they're talking about there is in the new source performance standards, which are themselves, there's a discussion of that, and that's complicated. But those regulations are actually in flux. There's confusion here because sometimes Montana Sulfur cites the NSPS rule when it's actually just a proposed rule. But our rejoinder to that point is this is a different program. EPA may be doing something different in the context of NSPS, and maybe that will get challenged, and maybe they'll lose. Maybe a citizen's group would come forward and say, you can't exempt startup shutdown and malfunction in that context and bring a lawsuit in that situation, and maybe EPA will lose. Maybe what the court in that case would do would be to look at the case law that Montana Sulfur virtually ignores that says EPA's policy, which has been essentially in place since the mid-1970s, its excess emissions policy. Two courts of appeals have looked at that issue in the context of state implementation plans and said that policy makes very good sense. And there I'm referring to the Michigan manufacturers or Michigan DEQ case, the Sixth Circuit case issued not that many years ago, and also the Arizona case, the Arizona Public Service Company case. I mean, if you look at that case, that's the, we cited it in our brief. I don't think you'll see any discussion of this point certainly in their opening brief. Well, if the policy memorandum from EPA, does that relate to the NSPS, or does that relate to these FIPS? I believe it relates to these FIPS. Essentially the argument is this. The NACs have to be protected at all times. And there can't be any exemption? Correct. There's no outright exemption for it. That being said. That being said, we have one. That being said, well, we have one. That's a different program in our new source performance. Here we don't have an out per se. What we have is EPA says, look, we recognize there's tension here. And this comes out of the Bunker Hill case in some measure. We recognize this is a difficult thing to balance. We do understand there are some times when companies may have no choice but to do something like flare. It's not limited to flaring. They could have emissions somewhere else in a factory. They say flares, but there are other ways that companies can have excess emissions. So what can we do about it? The act seems to point very strongly to preserving the NACs, to assuring the NACs are met at all times. Okay. We have the Bunker Hill case. EPA said, look, here's our compromise here. We're going to say if you can show us that it is truly a malfunction event, if there's really some or a startup shutdown event, that you used all of the best judgment and so forth, we are not going to – we're going to give you an affirmative defense to penalties. So that's how we insulate you. And that also, in EPA's view, that applies to citizens as well. Some citizens may argue that, no, we're not. That's EPA's view. We're not covered by that, and that's a different case. But it's not true. The EPA never has conceded that this affirmative defense doesn't apply to all lawsuits. So that's the compromise that EPA made. EPA also said, however, look, if there's always a possibility that there will be injunctive relief that will be awarded. It has to go through the judiciary. You will be able to make your arguments to a court. Look, Your Honor, we couldn't do anything about this. We used all of the best techniques. We did everything we could. You know, this is reality. And EPA said that's something that – EPA was content to say that will go to the courts and that will work its way through the courts. So that's the compromise that EPA made. How have the courts looked at that? I would suggest that there are two courts of appeals decisions that are right on point where the courts said that that balancing act, in the context of SIPs and NACs, is appropriate. And I'll just read very quickly from the one because I think it's right on point. EPA's longstanding – and this is a very recent case. This is 2009, 10th Circuit. EPA's longstanding policy explicitly states that a limited affirmative defense to penalties for malfunctions may be available where interference with the national air standards will not occur. Thus, EPA interprets the act as allowing a limited affirmative defense only in situations where attainment will not be detrimentally affected, and this is exactly what the federal plan provides. And then the Michigan manufacturers case is to the same effect. Montana suffers arguing very hard uphill when it tries to say that this policy has not been endorsed by the federal courts, including two courts of appeals who've looked at the issue. But the policy memorandum says there's not an exemption or affirmative defense. Is that right? There is, no. It says the excess emissions policy says there is an affirmative defense, yes. The 1999 policy? Yes, and basically it's consistent on that all the way through. It's affirmative defense to penalties is what it is. It does more than just – the attack in the early days was that EPA said, well, we can use enforcement discretion, and that was suggested as not being adequate. So then EPA actually took the next step and said, there's an affirmative defense to the penalties. I would also suggest, take it for what it's worth, they claim on the one hand in their briefs, we don't really flare up very much. It's really few and far between. They're inconsequential. Who cares about these emissions? There's no reason to even think about them. Then they say somewhere else in the briefs to the effect that we are going to be sued repeatedly in this situation because we have to flare. We're doing it sufficiently enough that we will be getting sued. This is a big issue for us. Then they do not use a lot of restraint when it comes to using extra record materials, I would suggest. But I'm looking at the brief and I'm saying, well, do I see some sort of explanation of all the citizen suits you've been hit with over the past years in this situation? There's nothing in there that indicates that they are suffering from a barrage of litigation. So I would just suggest that sort of the parade of horribles they say happens as a result. If it's going to happen, it certainly hasn't happened yet. I only have a few minutes left, so just to scan through the issues very quickly and just interrupt me if you have a question about what I'm saying, obviously. Do you have any other questions? I mean, it's well briefed, so we don't have any other specific questions. Thank you for that. But just very quickly, there's this notion that EPA can only do what's minimally necessary to attain the NAAQS. Again, Montana suffers arguing very much uphill on that proposition. We think the case law is clear that when EPA issues a FIP, it essentially stands in the shoes of the state. You could argue that when the Ninth Circuit said that before, they didn't really mean it. Okay, if that's the argument, fine. But that's what the case says. And we have other courts of appeals who have basically said the same thing. When EPA is issuing a FIP, we don't think Congress's intent was to have their hands tied. They should be able to essentially get the job done to make sure the gaps in the SIP are filled. And I want to just return to that point because that's what EPA did here. This is a surgical procedure. This is not a wholesale rewriting. You know, the state of Montana, who was represented to have had its rights trampled, I can't remember the adjective for it, but it's something like road roughshod over the state. Well, the state never sued EPA. It didn't sue it. It agreed with the SIP call. It did not sue it back in 2002 when EPA disapproved the SIP. It did not sue when EPA issued the FIP. It did not file an amicus brief saying we disagree with this whole approach. There's none of that in this case. So I think that whole notion of this federalism argument that underlies very much of what they're arguing is really very much overblown. I'd also note, I guess the obvious, that Montana Sulfur is the only regulated party here who's suing. There's a number of companies in the Yellowstone Valley. None of them have brought suit or filed any briefs in this case attacking EPA's decisions. Montana Sulfur, for want of a better word, has proven to be very litigious throughout this entire process, even going so far as to sue the state of Montana over the stack height issue. I don't think that's relevant in the sense of if they have a legitimate claim I understand. And they comply with Rule 11. The fact that some other company decides not to do it, I just don't think that's a fair aspersion to cast on Montana Sulfur. That's fine. Part of the reason I pointed out is that they act as if this is Montana Sulfur and the state versus the federal regulator. And I think that that is not really an appropriate way to view this. And for them, I believe it was an important part of their brief to have the entire case viewed through that prism. So that's why I pointed out. It's not a major point, obviously. I think, just given how scant my time is, there are the issues that they attack on the consent decrees, the consent decrees that were not part of the SIP. All of this is in your brief, isn't it? It's all in the brief. And these issues that, for want of a better word, I say or phrase, they're down in the weeds. These issues are all brief. They're all the sorts of issues on which EPA gets deference. They're all intended by EPA to result in a Clean Air Act for the citizens of Montana. Thank you. Thank you. At a minute, it's always difficult to say anything in 20 seconds, and we gave him a little bit of extra time as well. Thank you. Very quickly, the Commonwealth of Virginia, in 1997, said that the 1990 amendments did not change the basic structure of the act as articulated in train, union, electric, and the other cases. EPA's suggestion that Congress somehow expanded its authority in the 1990 amendments is wrong. EPA says, well, the NSPS rates are a different context, a different program. The laws of physics apply the same, regardless of what regulatory scheme you're under. If it's not feasible to not flare, then it's not feasible to not flare, regardless of whether you're targeting four small sources and buildings under Section 110 or a large state-of-the-art refinery under some other program. Michigan VDEQ predated Mead, which made clear that internal agency memos do not get deference. Georgia Power & Light postdated Mead and said that this memorandum does not deserve deference under Chevron. In Michigan VDEQ, the problem was not the regulation. You're basically saying you don't want any affirmative defense? We don't want the limitation. In Arizona Public Service, there was a work practice standard and controlled technology was available to allow compliance, unlike the present case where we cannot prevent flaring. Thank you, Your Honors. Thank you. Thank all counsel for your argument this morning. There's a lot of issues we understand. They've been well briefed and set out. And with that, Montana SOFR versus the EPA is submitted. We're adjourned for this morning. Thank you. It's all wrapped. This court is adjourned.
judges: Sedwick, Hawkins, McKeown